## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

KEVIN COTTINGIM,

      Plaintiff,

v.                                  Case No: 8:22-cv-1235-CEH-CPT

RELIASTAR LIFE INSURANCE
COMPANY,

      Defendant.

_____/

# O R D E R

      This matter comes before the Court on the parties' cross motions for summary judgment. Docs. 31, 32. In this action filed pursuant to the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001-1461 ("ERISA"), Plaintiff Kevin Cottingim moves for summary judgment in his favor on his claims for short-term and long-term disability benefits under group policies of insurance issued by Defendant ReliaStar Life Insurance Company ("ReliaStar" or "Defendant") to his former employer, EmployBridge, LLC. Doc. 31. ReliaStar responds in opposition (Doc. 39) and moves for summary judgment in its favor claiming Cottingim's claims for disability benefits were appropriately denied (Doc. 32). Cottingim filed a response in opposition to ReliaStar's motion (Doc. 38). Both parties filed replies to the respective responses. Docs. 41, 42. Upon due consideration of the parties' submissions,

including the Administrative Record,[1] memoranda of counsel, and Stipulation of Agreed Material Facts, and for the reasons that follow, Defendant's Motion for Summary Judgment (Doc. 32) will be granted, and Plaintiff's motion (Doc. 31) denied.

## I.   BACKGROUND[2]

### A.   Factual Background

Cottingim was hired by EmployBridge, LLC ("EBL") on April 4, 2016, and was expected to work a minimum of 30 hours per week. Doc. 22-1 at 31. His job title at EBL was Vice President of Human Resources. Doc. 40 ¶ 19. The job responsibilities for this position, as outlined by EBL, required managing: (1) traditional HR functions; (2) traditional comp/benefits functions (3) unemployment department; and (4) employee relations directors. Doc. 22-1 at 55. The traits needed for the position are personal skills of being communicative, team-oriented, project (not task) oriented, and extremely well-organized. *Id.*

*Short-Term Disability Plan*

As an employee of EBL, Cottingim had short-term disability ("STD") coverage through an employee welfare benefit plan sponsored by EBL (the "STD Plan"). Doc. 40 ¶ 1. Benefits under the STD Plan were provided through a group insurance policy issued to EBL by ReliaStar (the "STD Policy"). *Id.* ¶ 2. The STD Policy states that it

---

[1] The Administrative Record, which includes numerous duplicate documents, is filed in multiple docket entries. The Court references the Administrative Record by CM/ECF docket and page numbers. *See* Docs. 22-1–30-1.
[2] The Court has determined the facts based on the parties' submissions, including the Administrative Record and the Stipulation of Agreed Material Facts (Doc. 40).

is "delivered in the state of Texas and is governed by its laws." *Id.* ¶ 3. Incorporated in the STD Policy is an insurance certificate (the "STD Certificate"). *Id.* ¶ 4.

The STD Policy conditions weekly benefits on the employee's inability to perform the essential duties of his or her "regular occupation," defined as "the activity which, immediately prior to disability, you were regularly performing and which was your source of income from the Policyholder." *Id.* ¶ 5. The STD Policy further states that ReliaStar will assess a claimant's regular occupation as it is "normally performed in the national economy." *Id.* To qualify for benefits, the insured must "be receiving regular and appropriate care and treatment." *Id.*

STD benefits are payable for a maximum period of 26 weeks if all terms, conditions and provisions of the STD Policy are satisfied. *Id.* ¶ 6. Cottingim, as a participant in the STD Plan, was also furnished with a document titled "Summary Plan Description." *Id.* ¶ 7. The Summary Plan Description is preceded by the following statement: "The Summary Plan Description on the following pages is provided to you at the request of the Policyholder. It is not a part of the insurance certificate." *Id.* The Summary Plan Description states that ReliaStar has "final discretionary authority to determine all questions of eligibility and status, to interpret and construe the terms of this policy(ies) of insurance, and to make claim determinations." *Id.* ¶ 8.

### Long-Term Disability Plan

Cottingim, as an employee of EBL, also had long-term disability ("LTD") coverage through a benefit plan sponsored by EBL (the "LTD Plan"). *Id.* ¶ 9. Benefits under the LTD Plan were provided through a group insurance policy issued to EBL

by ReliaStar (the "LTD Policy"). *Id.* ¶ 10.  The LTD Policy indicates that it is governed by the laws of Texas.  *Id.* ¶ 11. Incorporated in the LTD Policy is an insurance certificate (the "LTD Certificate"). *Id.* ¶ 12.

The LTD Policy conditions monthly benefits on the claimant's inability to perform the material and substantial duties of his or her "regular occupation" through and beyond the 180-day elimination period. *Id.* ¶ 13. The insured "must be under the appropriate care of a doctor in order to be considered disabled." *Id.* The LTD Policy defines "regular occupation" as "the occupation you are routinely performing when your disability begins," as it is "normally performed in the national economy." *Id.* ¶ 14.

Benefits under the LTD Policy are payable to a claimant of Cottingim's age (63 at the time his alleged disability began) for a maximum total of 36 months, if all conditions, terms and provisions of the LTD Policy are satisfied and unless a limitation mandating a shorter benefit period applies. *Id.* ¶ 15. The LTD Policy provides that benefits for "disabilities due to Mental Illness and Alcoholism or Drug Abuse" are limited to a maximum total of 24 months. *Id.* ¶ 16.

Cottingim, as a participant in the LTD Plan, was also furnished with a document titled "Summary Plan Description." *Id.* ¶ 17. The Summary Plan Description is preceded by the following statement: "The Summary Plan Description on the following pages is provided to you at the request of the Policyholder. It is not a part of the insurance certificate." *Id.* The Summary Plan Description states that ReliaStar has "final discretionary authority to determine all questions of eligibility and

status, to interpret and construe the terms of this policy(ies) of insurance, and to make claim determinations." *Id.* ¶ 18.

*Application for Benefits, Denials, and Appeals*

Cottingim resigned from EBL as of August 18, 2020 and subsequently applied for STD and LTD benefits. *Id.* ¶ 20. His separation agreement included an effective date of resignation of August 25, 2020. Doc. 37. On November 20, 2020, ReliaStar denied Cottingim's STD claim. Doc. 40 ¶ 21. The denial was based on the findings provided by Dr. Hunter and Dr. Morgan that show Cottingim's "current condition is not impairing [him] from doing [his] current occupational duties." Doc. 22-1 at 545. ReliaStar goes on to indicate that Cottingim's providers have indicated his condition is behavioral health for which he is not currently seeking treatment. *Id.* Cottingim, through counsel, appealed the STD claim denial in correspondence dated March 5, 2021. Doc. 40 ¶ 22. On August 24, 2021, ReliaStar notified Cottingim that it was upholding on appeal the denial of his STD claim. *Id.* ¶ 23; Doc. 22-1 at 152–57.

On August 27, 2021, ReliaStar notified Cottingim of the denial of his LTD claim. Doc. 40 ¶ 24; Doc. 23-1 at 290–93. The findings of Dr. Boone's independent neuropsychological evaluation of June 11, 2021 showed no support of cognitive restrictions or limitations. *Id.* at 291. While ReliaStar acknowledged that Cottingim may have scored higher in some areas at some previous point in his life, it concluded that his test results were within normal limits across neurocognitive domains and were not indicative of a debilitating neurocognitive disorder. *Id.* at 291–92. Cottingim appealed the LTD denial on December 14, 2021. Doc. 40 ¶ 25. On February 8, 2022,

ReliaStar notified Cottingim of the decision to uphold on appeal the denial of his LTD claim. *Id.* ¶ 26; Doc. 23-1 at 81–84.  On May 27, 2022, after agreeing to reconsider its decision, ReliaStar notified Cottingim that it was again denying his appeal. Doc. 40 ¶ 27.

On May 27, 2022, Cottingim filed a two-count Complaint seeking short-term and long-term disability benefits under ReliaStar's group policies of insurance that are part of an employee welfare benefit plan established by EBL and governed by ERISA. Doc. 1.

### B.    The Policies

The Administrative Record contains copies of both policies at issue. Doc. 22-1 at 1–23 (short-term disability policy); Doc. 22-1 at 773–800 (long-term disability policy). The Summary Plan Descriptions ("SPD") for the short-term policy (Doc. 22-1 at 25–28) and the long-term policy (Doc. 23-1 at 1–5), which are not a part of the insurance certificates, grant ReliaStar "final discretionary authority to determine all questions of eligibility and status, to interpret and construe the terms of the polic(ies) of insurance, and to make claims determinations." Doc. 22-1 at 27; Doc. 23-1 at 4.

EBL's group short-term disability plan for employees of EBL includes all full-time presidents, vice presidents, senior vice presidents, area presidents, chief officers, and deputy general counsel, except CEO and CFO. Doc. 22-1 at 8. For an employee who becomes disabled and qualifies to receive benefits, the short-term disability ("STD") policy will pay employees weekly income benefits that are equal to 60% of weekly income not to exceed $1,000 per week, for a period up to a maximum of 26

weeks. *Id.* at 12, 15. To qualify for benefits under the STD policy, the employee must (1) be insured on the date he or she becomes disabled and the condition causing the disability is not an excluded condition;[3] (2) be insured on the date the benefit waiting period begins; (3) send notice of the disability as described in the Claim Procedures Section; (4) be receiving regular and appropriate care and treatment; and (5) have the length of disability approved by the disability management program. *Id.* at 15.

The STD plan defines "disability" or "disabled" as "ReliaStar's determination that a change in your functional capacity to work due to sickness or accidental injury has caused your inability to perform the essential duties of your regular occupation and as a result you are unable to earn more than 80% of your basic weekly earnings." *Id.* at 22. "Sickness" is described as "any physical illness, mental disorder, normal pregnancy or complication of pregnancy." *Id.* at 23. "Essential Duties" are defined as "duties which are normally required for the performance of an occupation as it is normally performed in the national economy and which cannot be reasonably omitted or modified." *Id.* at 22. "Regular occupation" refers to "the activity which, immediately prior to disability, you were regularly performing and which was your source of income from [EmployBridge]." *Id.* at 23. ReliaStar assesses the occupation

---

[3] In general, excluded conditions are identified as follows: sickness or injury that occurs in any armed conflict; sickness or injury that occurs while on military service for any county or government; intentionally self-inflicted injury or illness; injury that occurs when you commit or attempt to commit a felony; injury suffered in a fight in which you are the aggressor; sickness or injury due to cosmetic or reconstructive surgery; sickness or accidental injury for which you have a right to payment under a worker's compensation or similar law; sickness or accidental injury arising out of or in the course of work for pay, profit, or gain. Doc. 22-1 at 18. None of these exclusions apply here.

"as it is normally performed in the national economy, rather than how the duties and tasks are performed for a specific employer or at a specific location." *Id.* at 23.

"Regular and appropriate care" under the STD plan means:

- [The employee] personally visit[s] a doctor as often as is medically required, according to generally accepted medical standards and consistent with the stated severity of [the employee's] medical condition, to effectively manage and treat [the employee's] sickness or injury.
- [The employee is] receiving care which conforms with generally accepted medical standards for treating [the employee's sickness or injury and is consistent with the stated severity of your medical condition.
- Care is rendered by a doctor whose specialty or experience is the most appropriate for your disability according to generally accepted medical standards.
- [The employee is] receiving or actively seeking appropriate physical or psychological rehabilitative services.

*Id.*

Under the long-term disability ("LTD") policy, the classes of employees eligible to receive LTD benefits include all full-time presidents, vice-presidents, senior vice presidents, area presidents, chief officers, and Deputy General Counsel, except the CEO and CFO, who are in active employment with the employer. Doc. 22-1 at 779. The monthly benefit an eligible employee may receive under the LTD is 66.67% of monthly earnings up to a maximum benefit of $12,000 per month. *Id.* For a disability that starts when an eligible employee is 63 years old, the maximum period of payment is 36 months. *Id.* at 780.

8

An eligible employee is considered "disabled" under the LTD policy when ReliaStar reviews the employee's claim and determines that due to the employee's sickness or injury, (1) the employee is unable to "perform all the material and substantial duties of [the employee's] regular occupation;" and (2) the employee has a 20% or more loss in his indexed monthly earnings. Doc. 22-1 at 789. The employee "must be under the appropriate care of a doctor in order to be considered disabled." *Id.*

"Appropriate care" under the LTD policy requires the following:

- [The employee] visit[s] a doctor as frequently as medically required according to standard medical practice to effectively treat and manage [the employee's] disabling condition(s).
- [The employee] receive[s] care or treatment appropriate for the disabling condition(s), conforming with standard medical practice, by a doctor whose specialty or experience is appropriate for the disabling condition(s) according to standard medical practice.
- [The employee has] the obligation to minimize [the employee's] disabling condition including having corrective treatment or minor surgery.

*Id.* at 782. Disabilities due to alcoholism are limited to a maximum period of payment of 24 months of benefits under the LTD policy. *Id.* at 794.

## C.    The Medical Evidence, Testing, and Other Evaluations

A claim summary for Cottingim's STD claim reflects a disability onset date of August 18, 2020, based on a primary diagnosis of vascular dementia with behavioral

disturbance. Doc. 22-1 at 30. The Administrative Record includes the following medical, testing, and consultative information.

*1. Medical Evidence and Testing Prior to Disability Onset Date*

Cottingim's ACT scores for the 1972-1973 time frame were submitted by his counsel reflecting scores in the 95th to 98th percentile. Doc. 22-1 at 176. In 1974, a Stanford-Binet Intelligence Test was administered to Plaintiff when he was 16 years old that reflected Plaintiff had an I.Q. of 135. Doc. 122-1 at 177–78. The examiner stated that Plaintiff was "classified in the superior range as 99% of the population fall below him." *Id.*

Cottingim had cognitive testing administered in 2003 by Dr. Robert Bender, Ph.D., in conjunction with Plaintiff's candidacy for V.P. of training for Ameristar Casinos. Doc. 22-1 at 57–61. The assessment reflected an I.Q of 140, which is in the 99th percentile of the general population and in the 90th percentile for employees in similar positions. *Id.* at 57. On the Thurstone Test of Mental Alertness, Cottingim scored in the 86th percentile of college graduates and the 70th percentile for employees in similar positions. *Id.* Dr. Bender identified one of Cottingim's most significant professional assets for the position as having a "very superior level of general intellectual ability." *Id. at* 58. He described Cottingim as well suited to the senior level training environment, outgoing, venturesome, enthusiastic, high energy, and people-oriented. *Id.* Dr. Bender stated Cottingim has a positive and motivational approach to the leadership role, the ability to lead effectively, and high professional standards. *Id.*

at 59. He described Cottingim as having superior quantitative and analytical skills. *Id.* at 60.

Dr. Bender administered similar testing to Cottingim in October 2009 (Doc. 22-1 at 63–67), which reflected Cottingim had a full-scale I.Q. of 150, which was in the 99th percentile for the general population and the 90th plus percentile for employees in similar positions. *Id.* at 63. Cottingim scored in the 95th percentile of college graduates on the Thurstone test of Mental Awareness, which was in the 75th to 80th percentile for employees in similar positions. *Id.* As in his 2003 assessment, Dr. Bender described Cottingim's significant professional assets to include "very superior" intellectual ability, superior language and communication skills outgoing, venturesome, high energy, positive motivational approach, reliable, very high professional standards, and superior quantitative and analytical skills. *Id.* at 64–66.

An April 13, 2018 General Intelligence Assessment showed that Plaintiff's overall intellectual abilities were at that time in the "top 14% of the norm range." Doc. 22-1 at 564; *see also* Doc. 23-1 at 558–63. This percentile -- the result of a "weighted combination of Perceptual Speed, Number Speed & Accuracy, Reasoning, Word Meaning and Spatial Visualization" -- indicated that Plaintiff would be "extremely quick" to "process new information" and "acquire new skills and abilities." Doc. 22-1 at 564.

On August 19, 2019 Plaintiff underwent a brain MRI scan that revealed "small vessel ischemic disease" characterized by "hundreds of tiny cerebral infarcts," which was "definitive evidence" of a "neurological impairment," according to Dr. Hunter.

Doc. 22-1 at 557. The impression was "mild lateral ventriculomegaly with chronic ischemic leukoencephalopathies bilaterally, vascular dementia most likely." *Id.* at 462.

On October 11, 2019, Plaintiff underwent a neuropsychological evaluation administered by Michele York, Ph.D., from Baylor College of Medicine Doc. 22-1 at 655-60. Cottingim presented with complaints of increased forgetfulness in the past year. *Id.* at 655. Dr. York identified his premorbid intellectual functioning to be in the average range. *Id.* at 657. Cottingim's testing revealed results ranging from low average to very superior, which yielded a prorated estimate to be 109, i.e., in the "average" range. *Id.* at 657. His abstract verbal reasoning was "very superior." Performance on measures of attention/concentration ranged from high average to borderline impaired. *Id.* at 658. Executive functions varied from very superior to borderline impaired. *Id.* Dr. York opined Cottingim's neuropsychological performance is consistent with "cognitive decline in the areas of complex attention, processing speed and executive functions." Doc. 22-1 at 658. Dr. York noted Plaintiff's history of heavy alcohol use and current alcohol intake, which is reduced but remains heavy. *Id.* Dr. York's recommendations included Plaintiff reducing his alcohol intake because it has been shown to negatively impact cognitive functions, specifically higher order/executive functions. *Id.*

Cottingim first saw Dr. David Hunter, M.D., an Assistant Professor of Neurology at the University of Texas Health Science Center, on June 23, 2020 for concerns regarding his memory. Doc. 22-1 at 642–47. Cottingim relayed that, a year prior, his boss mentioned concerns about his work performance. *Id.* at 642. Cottingim

12

expressed difficulties with multi-tasking, stating it has become harder than before, and he had complaints of forgetting making plans or bringing paperwork. *Id.* Cottingim relayed that he had seen a neurologist at Baylor, but they did not get along because the neurologist thought his memory problems were related to his alcoholism. *Id.* Cottingim reported drinking two alcohol drinks per day but admitted being a much heavier drinker prior to a year and a half ago. *Id.* Upon neurologic exam, Dr. Hunter observed Cottingim had no confusion, no change in thought patterns, no decrease in concentrating ability, no speech difficulties, no exaggerated or inappropriate outbursts of emotion, no memory loss and no repeated questioning about recent events. *Id.* at 644. Delayed recall was 2/5 or 1/5. *Id.* No dysphasia or aphasia was observed. *Id.* at 645. Dr. Hunter noted that Cottingim is known to have cerebral small vessel ischemic disease (SVID). *Id.* at 646. He further noted that Dr. York was concerned for alcohol mild cognitive impairment (MCI), but Dr. Hunter had not seen Dr. York's records yet to be able to confirm. *Id.*

On June 29, 2020, Cottingim was seen again by Dr. Hunter for reports of worsening symptoms concerning his memory. Doc. 22-1 at 636–41. Cottingim described difficulties staying focused, remembering his security code, and recalling his schedule. He sleeps more than usual. *Id.* at 636. A review of his neurological systems reflected no confusion, no change in thought patterns, no decrease in concentrating ability, no speech difficulties, no memory loss and no repeated questioning about recent events. *Id.* at 638. Dr. Hunter further noted no anxiety, no personality change, no depression, no emotional problems, and no sleep disturbances. *Id.* His testing on a

mental cognitive exam and visuospatial/executive functioning was the same since his prior visit. *Id.* at 639. His delayed recall was 2/5 or 1/5. *Id.* No dysphasia/aphasia was observed. *Id.* Dr. Hunter's differential diagnosis is SVID, which he notes is "moderate" and not enough to explain Cottingim's symptoms. *Id.* at 640. Dr. Hunter also diagnosed alcoholism, which he suspects caused his frontal and parietal atrophy. *Id.* Dr. Hunter advised Cottingim that two drinks per day is still too many. *Id.* He recommended neuropsychological testing be repeated for comparison.

On July 27, 2020, Cottingim saw Dr. Hunter to review his symptoms. Doc. 22-1 at 630–35. Cottingim was requesting paperwork to be filled out for his disability related to his cognitive abilities and work status. *Id.* at 630. His neurologic exam was unchanged from his prior visits and continued to reflect no confusion, no change in thought patterns, no decrease in concentrating ability, no speech difficulties, no exaggerated or inappropriate outbursts of emotion, no memory loss and no repeated questioning about recent events. *Id.* at 632. Cottingim exhibited no anxiety, no personality change, no depression, no emotional problems, and no sleep disturbances. *Id.* No dysphasia/aphasia was observed. *Id.* at 633. His delayed recall was either 2/5 or 1/5. *Id.* Dr. Hunter's working diagnosis continued to be SVID and alcohol abuse. *Id.* at 634. His differential diagnosis included SVID, alcoholism, and neurodevelopmental delay (NDD). *Id.* Cottingim was to return after additional testing. *Id.* at 635.

On July 30, 2020, Cottingim underwent a neuropsychological evaluation administered by Darci Morgan, Ph.D., upon the referral by Dr. Hunter. Doc. 22-1 at 648–52. Plaintiff presented with complaints of memory loss, distractibility, variable processing speed, and visuospatial problems. *Id.* at 648. Plaintiff reported a long-standing reputation of forgetfulness, but his symptoms reportedly worsened over the past year and a half. *Id.* He also reported a history of alcohol misuse. *Id.* at 651. Although his test engagement was inconsistent, Cottingim scored at or above normal expectations on most of his tests. *Id.* at 650. Dr. Morgan did observe there was evidence of a possible "decline from his premorbid level of functioning." *Id.* at 651. Dr. Morgan's recommendations included abstinence from alcohol or alternatively an in-patient or intensive out-patient alcohol rehabilitation program. *Id.* Dr. Morgan's overall impressions were possible mild cognitive impairment, non-amnestic; adjustment disorder with anxiety; and alcohol use disorder. *Id.* at 651.

On August 5, 2020, Dr. Hunter completed an attending physician statement in support of Cottingim's anticipated disability claim. Doc. 22-1 at 662–664. Dr. Hunter noted that he first treated Cottingim on June 23, 2020, for symptoms of reported memory loss, inability to stay focused, remember security codes, and recall schedule, which first appeared in August 2019. *Id.* at 662. As of the date of the statement, Dr. Hunter had not yet made a diagnosis, and he indicated that the progress of Cottingim's condition was unchanged from his first visit in June 2020. The statement included no restrictions or limitations. *Id.* at 664.

Dr. Hunter saw Cottingim again on August 10, 2020, to review the neuropsychological testing done. Doc. 22-1 at 624–29. Dr. Hunter noted that the testing done by Dr. Morgan showed Cottingim's test results were borderline normal with only a few scores below expectations. He observed there was overall improvement since Dr. York's testing. *Id.* at 624. Cottingim expressed worry that the improvement from Dr. York's testing will impact his disability claim. *Id.*

*2. Medical Evidence, Testing and Other Information After Disability Onset Date*

On August 18 and 25, 2020 Nurse Sherry Roy reviewed Cottingim's medical records at the request of ReliaStar. Doc. 22-1 at 673, 591; Doc. 23-1 at 565–66. Nurse Roy concluded the medical records do not support Cottingim's functional impairment. She states Cottingim's condition is likely BH, referring to behavior health, as indicated by Dr. Hunter who opined adjustment disorder with anxiety and alcohol use disorder, both of which can contribute to impaired memory issues. Nurse Roy also notes that neuropsychological evaluation conducted in July 2020 recommended Cottingim treat his adjustment disorder and there is no indication of any behavioral health treatment undertaken.

On September 14, 2020, Cottingim's former supervisor Paul Galleberg wrote a letter in support of Plaintiff's disability claim stating he noticed a decline in Cottingim's work performance over the past 18 months that they worked together. Doc. 23-1 at 556. Specifically, Galleberg directed Cottingim to take notes when they conversed and repeat them back to assist Cottingim with his forgetfulness. Galleberg stopped working for EBL in June 2020.

16

Michael Baer, who worked closely with Cottingim at EBL for five years, submitted a letter on September 22, 2020, in support of Plaintiff's claim. Doc. 23-1 at 557. Baer observed that Cottingim's attributes of being quick, responsive, thorough, and detailed gradually changed. Cottingim had increasing memory lapses, failed to deliver on time, acted confused and withdrawn, and was not participating. As Cottingim's symptoms worsened, his work performance weakened. According to Baer, Cottingim left EBL "partly due to his physical and mental restrictions." *Id.*

In a letter dated October 28, 2020, Dr. Hunter responds to Nurse Roy's request for information regarding functional capacity. Doc. 22-1 at 556–60. He opines that because Cottingim's premorbid state was in the superior range, a drop to low average represents a major decline for Cottingim, although objectively it is still within the range of normal for the population. *Id.* at 557. Dr. Hunter relies on the August 19, 2019 brain MRI as the most definitive evidence Cottingim has a neurological impairment. In Dr. Hunter's opinion, Cottingim has a mild cognitive impairment due to brain damage from both vascular disease and alcohol dependence. *Id.*

On November 4, 2020, Nurse Roy reviewed Dr. Hunter's response and the letters from Cottingim's employer. Doc. 22-1 at 553–54. She observed that Dr. Hunter has provided no new compelling medical information or updated records to support a deterioration in condition since August 2019, after which Cottingim continued to work for a year. As for the employer letter regarding Cottingim's decline in performance, she opines this could be contributable to reported alcohol dependence.

A December 15, 2020 Facebook post by Cottingim identified himself as of 2020 "Retired permanently in Clearwater, Florida." Doc. 24-1 at 166. LinkedIn post by Cottingim reflects he's retired permanently as of August 2020. He posts: "I am now permanently retired and am not exploring opportunities of any kind." *Id.* at 167–69.

On December 21 and 22, 2020, Lawrence Salmansohn, Ed.D., board-certified in clinical neuropsychology, conducted a neuropsychological evaluation of Cottingim at the request of Cottingim's attorneys to assess his neurobehavioral functioning. Doc. 22-1 at 69–88. Dr. Salmansohn noted Cottingim's history of Type 1 insulin dependent diabetes since age 11, with adult-onset hypertension and problematic heavy drinking. *Id.* at 84. Cottingim reported a sudden onset of prosopagnosia[4] over ten years prior after suffering a mini-stroke, but he continued to work. *Id.* at 86. According to Cottingim, he experienced a progressive cognitive decline. *Id.* at 84. After Cottingim's boss confronted him on his difficulties, Cottingim concluded he was unable to adequately perform the duties of his "highly demanding position" as "senior vice president of human resources." *Id.*

Dr. Salmansohn administered intellectual functioning tests to Cottingim which revealed a full scale I.Q. of 120, which is considered "superior" and to be in the 91st to 97th percentile. *Id.* at 76. Cottingim's performance on the Verbal Comprehension Index was equivalent to a standard score of 136, which is in the "very superior" or

---

[4] Prosopagnosia is a neurological disorder characterized by the inability to recognize faces. *See* https://www.brainfacts.org/diseases-and-disorders/neurological-disorders-az/diseases-a-to-z-from-ninds/prosopagnosia (last accessed February 7, 2024).

98th plus percentile. *Id.* On the Perceptual Organization Index, which measures non-verbal fluid reasoning, attention to detail, and visual motor integration, Cottingim's performance was equivalent to a standard score of 111, which is in the "high average" range or the 75th to 90th percentile. *Id.*

Stating that tests of premorbid functioning showed Cottingim to have been "at least in the Superior range of general intellectual functioning premorbidly," Dr. Salmansohn reported that his evaluation in December 2020 had revealed "significant cognitive impairments in multiple areas," including fluid intelligence, attention/concentration, and memory. *Id.* at 84, 86. However, Cottingim's abstract verbal reasoning was above average and his complex problem solving was in the range expected. *Id.* at 84. Additionally, Cottingim's visual spatial perception and constructional abilities appeared intact, as was his memory for rote, autobiographical information. *Id.* at 85. Dr. Salmansohn opined that Plaintiff was now impaired by vascular dementia "to the point that he is unable to perform the material and substantial duties of his profession in the consistent and reliable manner demanded by his professional responsibilities." *Id.* at 86. Dr. Salmansohn recommended Cottingim improve his health behaviors including exercise, diet, and eliminating alcohol consumption. *Id.* at 87.

A brain MRI was done December 23, 2020, which showed central atrophy with moderate periventricular T2 signal abnormality, which was unchanged when compared to the prior MRI on August 19, 2019. *Id.* at 90. No evidence of acute

ischemia or acute demyelination demonstrated. *Id.* No intracranial mass or hemorrhage demonstrated, unchanged. *Id.*

Dr. Bender submitted a letter dated February 10, 2021 on Cottingim's behalf. Doc. 93–95. Based on his review of Dr. Salmansohn's December 2020 evaluation, Dr. Bender opined the declines in Plaintiff's I.Q. testing was consistent with "organic changes in neurological/brain functioning and is highly significant with respect to predicting job performance." *Id.* at 94. Dr. Bender further stated that in view of Cottingim's current "clear deficits in problem solving and memory skills," it would not be "remotely possible" for him to meet the requirements of the positions he has previously held. *Id.* at 95. However, Dr. Bender also indicated his 2003 and 2009 testing resulted in scores higher than needed to perform his position as V.P. of human resources. *Id.* at 94.

An occupational analysis was completed by Mary P. O'Malley on March 16, 2021, to identify how Cottingim's occupation is performed in the national economy. Doc. 22-1 at 376–82. She indicated the appropriate comparative occupation per the eDOT is Vice President of Human Resources. Per eDOT code 189.117-085, a Vice President, Human Resources "directs, plans, develops, establishes, implements, and administers the personnel and human resources management function in accordance with the objectives of [the] organization." *Id.* at 377. The cognitive requirements for the position are measured by extremely high (score of 5); high (score of 4); medium (score of 3); low (score of 2) and markedly low (score of 1). *Id.* at 378. For this position, the following abilities require a high (4) aptitude: general learning ability, verbal

20

aptitude, and numeric aptitude. *Id.* at 379. A medium (3) aptitude is required for clerical perception, and a low (2) aptitude is required for spatial aptitude, form perception, motor coordination, finger dexterity, and manual dexterity. *Id.* None of the cognitive requirements mandated an extremely high aptitude.

On March 29, 2021, Dr. Malcolm Spica, Ph.D., licensed clinical psychologist, completed a file review of Plaintiff's medical records at the request of ReliaStar. Doc. 22-1 at 310. Dr. Spica concluded that no behavioral health or neurocognitive limitations were supported by the records. While Dr. Spica acknowledged some change in Cottingim's cognitive status, he nevertheless concluded it did not rise to the level of being a disabling impairment that would preclude Cottingim from performing his occupational duties as described by Ms. O'Malley's OA.

On April 8, 2021, Dr. Salmansohn submitted a letter following his review of Dr. Malcolm Spica's response to his evaluation. Dr. Salmansohn challenges Dr. Spica for cherry-picking the select above average scores and ignoring those impaired or statistically significantly reduced scores. *Id.* at 98–103.

On April 19, 2021, a Vocational Rehabilitation Assessment was completed by Joseph Atkinson at the request of Cottingim's counsel to evaluate whether the medical documentation supports Plaintiff's inability to return to work. Doc. 114–117. After describing the responsibilities of Cottingim's position as VP of Human Resources, Atkinson categorized the job by the following occupations identified in the Dictionary of Occupational Titles ("DOT"): Vice President (DOT # 186.117-034 and Personnel Manager (DOT # 166.117-018). *Id.* at 115. Atkinson explained that two DOT job

descriptions are required to accurately represent Cottingim's administrative responsibilities as well as his responsibilities performing and overseeing personnel functions. *Id.* Atkinson opined that Cottingim's occupation requires general learning ability and verbal aptitude at the "extremely high" level or above the 89th percentile. Because Cottingim's occupation is highly skilled and requires well above average aptitude in various cognitive areas per the DOT, Atkinson disagrees with ReliaStar that Cottingim can return to his regular occupation. *Id.* at 117.

On April 29, 2021, Dr. Spica supplemented his report following the vocational assessment completed by Joseph Atkinson and the April 8, 2021 letter of Dr. Salmansohn. Doc. 26-1 at 263. Dr. Spica recommended ReliaStar obtain a comprehensive and conventional independent neuropsychological examination to determine ongoing restrictions and limitations, if any.

On June 11, 2021, a neuropsychological evaluation was administered by James Boone, Ph.D. at ReliaStar's request. Doc. 22-1 at 219–37. Cottingim reported to Dr. Boone that he stopped work as a senior VP due to cognitive impairment associated with long-term diabetes and alcohol use disorder. *Id.* at 219. He reported drinking 8 to 10 alcoholic drinks per day from 2013 until 2018, at which time he reduced his intake to 2 to 3 drinks per week which is his current frequency. *Id.* at 220. Cottingim resided in Texas from 2008 until 2020, when he moved to Dade City, Florida. He states he does not intend to work in his job or any other similar occupation. In his report dated June 22, 2021, Dr. Boone reported that Plaintiff performed in the "Average" range on the majority of tests, with some at the "Low Average" or "High Average" level. *Id.* at

226-28. Dr. Boone also opined that Plaintiff's premorbid functioning was "likely in the Average range." *Id.* at 230.

On June 25, 2021, Dr. Malcolm Spica, Ph.D. reviewed the neuropsychological IME report prepared by Dr. Boone and concluded that it did not provide evidence of neurocognitive or behavioral health dysfunction that rises to the level of impairment. Doc. 22-1 at 210–211.

On July 18, 2021, Dr. Salmansohn submitted a letter with his review of the Independent Neuropsychological Evaluation performed by Dr. Boone. *Id.* at 105–112. Dr. Salmansohn responds to Dr. Boone's criticisms that he used the Wechsler III system as opposed to the Wechsler IV, arguing that Wechsler IV has not been universally accepted as an improvement.

On July 25 and 29, 2021, Dr. Spica supplemented his report following his review of additional information submitted regarding Cottingim's claim. Doc. 22-1 at 165, 171. Dr. Spica concluded that the newly submitted information did not provide additional quantified evidence to support Cottingim's claim of disability. *Id.*

On September 28, 2021, Cottingim saw Dr. Gabriel Pantol of the Watson Clinic for complaints of memory loss. Doc. 23-1 at 152-58. Dr. Pantol diagnosed Cottingim with mild cognitive impairment (MCI), brain atrophy, small vessel disease (cerebrovascular), lesion of left ulnar nerve, tremors, and diabetes mellitus. *Id.* at 157–58. Cottingim reported a longstanding history of alcohol abuse, but he claims to have quit three years prior. *Id.* at 152. Cottingim's occupational status was listed as "retired." *Id.* at 153. Upon neurologic exam, Cottingim was positive for dizziness,

23

tremors, and weakness. *Id.* at 155. He could name and repeat 3 out of 3 objects, but he recalled zero out of 3 objects. *Id.* He knew the month and year but missed the date. *Id.* Dr. Pantol was going to refer Cottingim to the Byrd Institute in Tampa for his cognitive deficits.

At the request of ReliaStar, consulting psychologist Staci Ross, Ph.D. conducted a file review. On January 10, 2022, Dr. Ross reported that Plaintiff was "likely demonstrating a possible neurocognitive disorder" that was "consistent with [his] history of small vessel ischemic disease." Doc. 23-1 at 136. Dr. Ross concluded that because Plaintiff's recent neuropsychological evaluations were "generally within the average range," his condition was not "functionally impairing." *Id.* at 139.

Cottingim was seen at First Choice Neurology from March 1, 2022 through May 3, 2022. On May 3, 2022, neurologist Jeffrey Gelblum, M.D., diagnosed Cottingim with Alzheimer's disease unspecified. Doc. 23-1 at 63-70.

### D.   The Parties' Motions

Cottingim moves for summary judgment in his favor seeking judicial reversal of ReliaStar's denial of his claims for short-term and long-term disability benefits. Doc. 31. In support of his motion, Plaintiff argues that ReliaStar failed to compare his current cognitive abilities with the demands of his occupation. ReliaStar denied his STD claim largely based on Dr. Spica's file-review and the finding that Dr. Boone's cognitive testing showed Plaintiff's scores "were within normal limits." Similarly, ReliaStar denied Plaintiff's LTD claim based on Dr. Boone's evaluation showing Cottingim's scores were within normal limits. In denying his appeal, ReliaStar relied

on consulting psychologist Dr. Staci Ross's conclusion that Plaintiff's recent neuropsychological evaluations were "generally within the average range" and his condition was "not functionally impairing."

According to Cottingim, these conclusions fail to take into account that his occupation as Vice President of Human Resources requires cognitive abilities that were higher than average cognitive functioning. He argues that the record demonstrates he had the necessary cognitive abilities to perform his mentally demanding occupation prior to 2019, but he experienced a disabling cognitive decline which left him unable to meet his occupational demands as evidenced by the testing and as observed by his workplace supervisor and colleague. Cottingim urges the Court to apply a *de novo* standard of review because the Summary Plan Description which contains the discretionary language is not part of the policy, and in any event, Texas law[5] prohibits insurers from using discretionary clauses. Even if the Court applies a discretionary standard, Plaintiff submits that ReliaStar's decisions wholly disregarded the occupational demands of Cottingim's position and were therefore arbitrary and capricious.

ReliaStar moves for summary judgment in its favor, arguing its decisions to deny STD and LTD benefits were reasonable and should be upheld because the records do not support Cottingim's inability to perform the essential, material, and substantial duties of his regular occupation. Doc. 32. ReliaStar also argues Cottingim's

---

[5] The policies provide that they are governed by the laws of Texas and, to the extent applicable, ERISA. *See* Doc. 22-1 at 2, 764, 774; *see* also Doc. 40 ¶¶ 3, 11.

failure to follow his providers' recommendations and seek appropriate care precludes a finding that he is disabled under the policies. Because Cottingim did not establish that he suffered from a sickness which precluded him from performing his occupational duties prior to his resignation and while he was still under coverage, ReliaStar urges this Court to find its decisions were correct, reasonable and supported by substantial evidence.

## II.    LEGAL STANDARD

Although this case comes before the Court on cross motions for summary judgment, the summary judgment standard set forth in Fed. R. Civ. P. 56 is incongruent with the ERISA standard of review. *Compare* Fed. R. Civ. P. 56(c), *with Williams v. BellSouth Telecomms., Inc.*, 373 F.3d 1132, 1138 (11th Cir. 2004), *overruled on other grounds by Doyle v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1352 (11th Cir. 2008). The Eleventh Circuit charges the district court with determining *de novo* whether the administrator's decision was wrong, *Williams*, 373 F.3d at 1138, rather, than whether there are questions of material fact that require trial and whether the parties are entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). There may indeed be unresolved factual issues evident in the administrative record, but unless the administrator's decision was wrong, these issues will not preclude summary judgment as they normally would. *See Crume v. Metro. Life Ins. Co.*, 417 F. Supp. 2d 1258, 1272–73 (M.D. Fla. 2006) (conducting an in-depth discussion of interplay between ERISA and summary/cross summary judgment standards as applied by courts in the Middle District of Florida and elsewhere).

ERISA itself provides no standard for courts reviewing the benefits decisions of plan administrators or fiduciaries. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 (1989). Thus, based on the Supreme Court's guidance in *Bruch* and *Metropolitan Life Insurance Co. v. Glenn,* 554 U.S. 105 (2008), the Eleventh Circuit has established a multi-step framework to guide courts in reviewing an ERISA plan administrator's benefits decisions. *Blankenship v. Metro. Life Ins. Co.,* 644 F.3d 1350, 1355 (11th Cir. 2011). Under this six-step rubric, a district court must:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
> (2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
> (3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
> (5) If there is no conflict, then end the inquiry and affirm the decision.
> (6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.[6]

*Id.* (citing *Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1195 (11th Cir. 2010)). In the Eleventh Circuit, "a district court conducting a *de novo* review of an Administrator's

---

[6] In ERISA cases, the phrases "arbitrary and capricious" and "abuse of discretion" are used interchangeably. *See Jett v. Blue Cross & Blue Shield of Ala., Inc*., 890 F.2d 1137, 1139 (11th Cir. 1989).

benefits determination is not limited to the facts available to the Administrator at the time of the determination." *Harris v. Lincoln Nat'l Life Ins. Co.*, 42 F.4th 1292, 1295 (11th Cir. 2022) (quoting *Kirwan v. Marriott Corp.*, 10 F.3d 784, 789 (11th Cir. 1994)). But when review is based on an arbitrary and capricious standard, the review will be limited to the administrative record. *Harris*, 42 F.4t at 1296 (citing *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1246 (11th Cir. 2008) and *Blankenship,* 644 F.3d at 1355).

At step four of the test, a conflict of interest exists "where the ERISA plan administrator both makes eligibility decisions and pays awarded benefits out of its own funds." *Id.* (citing *Glenn*, 554 U.S. at 105). Even if a conflict exists and, accordingly, a court reaches step six, "the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest." *Doyle v. Liberty Life Assur. Co. of Boston,* 542 F.3d 1352, 1360 (11th Cir. 2008). The severity of the conflict and the nature of the case will determine the effect that a conflict of interest has in any given case and, accordingly, the Court will look to the conflict's "inherent or case-specific importance." *Blankenship*, 644 F.3d at 1355 (citing *Glenn*, 554 U.S. at 117). After *Glenn,* the existence of a conflict of interest should merely be a "factor" for the district court to consider when determining whether an administrator's decision was arbitrary and capricious, but the basic analysis still centers on whether a reasonable basis existed for the administrator's decision. *See id.* (citing *Conkright v. Frommert*, 559 U.S. 506, 521 (2010) (noting that the plan administrator's interpretation of the plan "will not be disturbed if reasonable")).

As both the Eleventh Circuit and the Supreme Court have noted, "the presence of a structural conflict of interest [is] an unremarkable fact in today's marketplace [and] constitutes no license, in itself, for a court to enforce its own preferred *de novo* ruling about a benefits decision." *Blankenship*, 644 F.3d at 1356; *see also Glenn*, 554 U.S. at 120 (noting that a "conflict of interest . . . is a common feature of ERISA plans.") (Roberts, C.J., concurring in part and concurring in the judgment). However, even where a conflict of interest exists, courts still owe deference to the plan administrator's "discretionary decision-making" as a whole. *Doyle,* 542 F.3d at 1363; *see also Glenn,* 554 U.S. at 120 (noting the "deference owed to plan administrators when the plan vests discretion in them").

### De Novo Versus Abuse of Discretion Standard

When an ERISA plan lawfully delegates discretionary authority to the plan administrator, a court reviewing the denial of a claim is limited to assessing whether the administrator abused that discretion. *Bruch*, 489 U.S. at 115. For plans that do not have valid delegation clauses, the Supreme Court has held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard." *Id.* Cottingim argues that the *de novo* standard applies at each step of the *Blankenship* analysis. ReliaStar disagrees, arguing that if the Court goes beyond step one in the analysis, the abuse of discretion standard applies. Because the Court finds below that the administrator's decision was not *de novo* wrong, the analysis does not proceed beyond the first step of the *Blankenship* rubric.

If the Court were required to go beyond step one, however, the *de novo* standard would likely still apply because under Texas law, which governs the policies here, discretionary clauses in insurance policies are invalid. "In 2011, Texas enacted legislation that banned discretionary clauses in . . . policies including those for 'accident or health insurance.'" *Koch v. Metro. Life Ins. Co.*, 425 F. Supp. 3d 741, 747 (N.D. Tex. 2019) (citing *Woods v. Riverbend Country Club*, 320 F. Supp. 3d 901, 908 (S.D. Tex. 2018) (citing Tex. Ins. Code §§ 1701.062(a), 1701.002)). Under Texas Insurance Code, "[a]n insurer may not use a document described by Section 1701.002 in [the State of Texas] if the document contains a discretionary clause." Tex. Ins. Code § 1701.062(a). The statute goes on to define "discretionary clause" to include a provision that:

> 1) purports or acts to bind the claimant to, or grant deference in subsequent proceedings to, adverse eligibility or claim decisions or policy interpretations by the insurer; or
> (2) specifies:
> (A) that a policyholder or other claimant may not contest or appeal a denial of a claim;
> (B) that the insurer's interpretation of the terms of a document or decision to deny coverage or the amount of benefits is binding upon a policyholder or other claimant;
> (C) that in an appeal, the insurer's decision about or interpretation of the terms of a document or coverage is binding; or
> (D) a standard of review in any appeal process that gives deference to the original claim decision or provides standards of interpretation or review that are inconsistent with the laws of this state, including the common law.

Tex. Ins. Code Ann. § 1701.062(b).

The Fifth Circuit recently noted that the Texas insurance code provision only renders discretionary clauses unenforceable; "it does not attempt to prescribe the standard of review for federal courts deciding ERISA cases." *Ariana M. v. Humana Health Plan of Texas, Inc.*, 884 F.3d 246, 250 (5th Cir. 2018). The court did not address, however, whether the Texas statute is preempted by ERISA because the argument was not raised in that case. *Id.* at 248. But the *Ariana* court specifically noted that the courts to have decided the issue have concluded that ERISA does *not* preempt state anti-delegation statutes. *Id.* at 250 n.2 (citing *Fontaine v. Metro. Life Ins. Co.*, 800 F.3d 883, 891 (7th Cir. 2015); *Standard Ins. Co. v. Morrison*, 584 F.3d 837, 842–45 (9th Cir. 2009); *Am. Council of Life Insurers v. Ross*, 558 F.3d 600, 604–09 (6th Cir. 2009); *see also Hancock v. Metropolitan Life Ins. Co.*, 590 F.3d 1141, 1149 (10th Cir. 2009) (stating that a full ban on discretionary clauses would not likely be preempted, even though ERISA preempted a state statute regulating them).

In addressing the issue, the Ninth Circuit held that the Montana Insurance Commissioner's "practice of disapproving discretionary clauses is not preempted by ERISA's exclusive remedial scheme." *Standard Ins. Co. v. Morrison*, 584 F.3d 837, 849 (9th Cir. 2009). Citing *Morrison*, the Northern District of Texas, similarly concluded that ERISA does not preempt the Texas law prohibiting discretionary clauses.

> Looking at the interplay between ERISA's preemption, savings, and deemer clauses makes this clear. 29 U.S.C. §§ 1144(a), 1144(b)(2)(A), 1144(b)(2)(B). The statute's preemption clause expressly preempts "any and all State laws insofar as they...relate to any employee benefit plan." *Id.* § 1144(a). The savings clause provides that, "[e]xcept as

> provided in subparagraph (B) [i.e., the deemer clause],
> nothing in this subchapter shall be construed to exempt or
> relieve any person from any law of any State which
> regulates insurance, banking, or securities." *Id.* §
> 1144(b)(2)(A). And the deemer clause establishes that
> "[n]either an employee benefit plan ..., nor any trust
> established under such plan, shall be deemed to be an
> insurance company ... engaged in the business of insurance
> ... for purposes of any law of any State purporting to
> regulate insurance companies [or] insurance contracts." *Id.*
> § 1144(b)(2)(B).

*Curtis v. Metro. Life Ins. Co.*, No. 3:15-CV-2328-B, 2016 WL 2346739, at *6 (N.D. Tex.

May 4, 2016). Because the Court does not proceed beyond step one of the *Blankenship*

analysis, however, the Court need not decide what standard of review applies after

step one.

## III.   DISCUSSION

ERISA permits a person denied benefits under an employee benefit plan to

challenge that denial in federal court. 29 U.S.C. § 1001 *et seq.*; *see* § 1132(a)(1)(B). A

plaintiff who files an action under this provision bears the burden of proving his

entitlement to contractual benefits. *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d

1038, 1040 (11th Cir. 1998) (citing *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 658

(8th Cir. 1992)); *see also Waggenstein v. Equifax, Inc.*, 191 F. App'x 905, 911 (11th Cir.

2006). Because Cottingim does not establish he is disabled under the STD and LTD

policies, he fails to carry his burden.

At the first step of the *Blankenship* analysis, the Court applies the "*de novo*

standard" to determine whether ReliaStar's benefits-denial decision is "wrong" (i.e.,

whether the Court disagrees with the administrator's decision). If ReliaStar's denial decision is "*de novo* wrong," the Court proceeds to the next step; if not, the inquiry ends, and the decision is due to be affirmed. *Blankenship*, 644 F.3d at 1355. "[W]hen conducting *de novo* review, "the district court's charge [is] to put itself in the agency's place, to make anew the same judgment earlier made by the agency[.]" *Harris*, 42 F.4th at 1296 (citing *Doe v. United States*, 821 F.2d 694, 698 (D.C. Cir. 1987)). For the reasons discussed below, having conducted a *de novo* review, the undersigned concludes the benefits decisions were not wrong and, therefore, should be affirmed.

In its analysis, the Court turns first to the policies' definition of disability. Under the STD plan, "disability" or "disabled" means "ReliaStar's determination that a change in your functional capacity to work due to sickness or accidental injury has caused your inability to perform the essential duties of your regular occupation." Doc. 22-1 at 22. Similarly, under the LTD plan, an eligible employee is considered "disabled" when ReliaStar reviews the employee's claim and determines that due to the employee's sickness or injury, the employee is unable to "perform all the material and substantial duties of [the employee's] regular occupation." *Id.* at 789. To be eligible for STD coverage, Cottingim must have been insured on the date he became disabled and was receiving regular and appropriate care and treatment. Doc. 22-1 at 15. LTD benefits are payable the day after the elimination period (180 days) is completed. *Id.* at 779. To be entitled to LTD benefits, Cottingim "must be under the appropriate care of a doctor in order to be considered disabled." *Id.* at 789.

Cottingim challenges ReliaStar's decisions denying him STD and LTD benefits after concluding that Cottingim's scores on cognitive testing were within normal limits. ReliaStar contends that nothing in Cottingim's records or testing supported the disabling limitations claimed. Cottingim primarily argues that denial of his benefits was wrong because ReliaStar failed to compare his current cognitive abilities with the demands of his occupation. Specifically, he submits that he meets the policy's definition of disabled because having "average" cognitive functioning is inadequate where his occupation as a Vice President of Human Resources demands higher than average cognitive functioning.

As a preliminary matter, under both plans, ReliaStar was not limited to looking at the way Cottingim performed his job for EBL, but rather was entitled to assesses the occupation "as it is normally performed in the national economy, rather than how the duties and tasks are performed for a specific employer or at a specific location." Doc. 22-1 at 23, 784.

In determining how the occupation was performed in the national economy, ReliaStar's consultant relied on the Economic Research Institute's Occupational Assessor (e-DOT) to determine that Cottingim's regular occupation was "Vice President, Human Resources." Doc. 22-1 at 374–82. Although Cottingim's consultant instead relied on the Dictionary of Occupational Titles' (DOT) definition for two separate positions, Cottingim fails to cite any legal authority to demonstrate that ReliaStar's reliance on the e-DOT occupational assessor was in error.

In support of his claim that ReliaStar failed to properly consider the demands of his occupation, Cottingim cites *Lesser v. Reliance Standard Life Insurance Co.*, 385 F. Supp 3d 1356 (N.D. Ga. 2019), for the proposition that "[e]ven a "mild" impairment to executive functioning could prevent someone from performing a cognitively demanding job." *Id.* at 1372. In *Lesser*, the insurer relied on a neuropsychological evaluation that showed plaintiff's test results were "largely normal" with only "mild executive function inefficiency" to conclude plaintiff's condition would not prevent him from performing the cognitive tasks of a software engineer. *Id.* at 1371–72. The court rejected the insurer's reliance on this independent evaluation which conflicted with the overwhelming evidence of plaintiff's treating physicians to the contrary. *Id.* at 1372. *Lesser* is factually distinguishable given the extent of medical evidence supporting Lesser's disability claim compared to the instant case. The medical history in *Lesser* reflected plaintiff was first diagnosed with obstructive sleep apnea in 2006. The administrative record contained visit notes, test results, and other records from plaintiff's treating providers that spanned over ten years documenting his hypersomnolence, its progressive worsening, and plaintiff's treatment for it. *Id.* at 1364–66.

In contrast, the administrative record here presents a different picture. Although Cottingim submits MRI findings from a brain scan in August 2019 which revealed "small vessel ischemic disease," a brain scan conducted over a year later in December 2020—the time period in which he claims significant worsening of his symptoms— was essentially unchanged. Additionally, Cottingim's medical records regarding his

35

memory loss and inability to focus appear primarily related to his making a disability claim, as opposed to any ongoing regular treatment and care.

Cottingim had a brain MRI in August 2019, but the only follow up after that was a one-hour neuropsychological evaluation in October 2019 by Dr. York, until Cottingim saw Dr. Hunter in June 2020. He presented to Dr. Hunter with complaints of memory loss and reported that his boss expressed concerns a year ago about his performance at work. Doc. 22-1 at 642. According to Dr. Hunter, Cottingim reported that he and Dr. York did not get along because the doctor was convinced his memory impairment was due to being an alcoholic. *Id.*

On July 30, 2020, Plaintiff underwent a neuropsychological evaluation administered by Darci Morgan, Ph.D., upon the referral by Dr. Hunter. Dr. Morgan noted that Cottingim's test engagement was inconsistent, but that he still scored at or above normal expectations on most of his tests. On August 10, 2020, Dr. Hunter reviewed Dr. Morgan's neuropsychological testing with Plaintiff, noting Cottingim's test results were borderline normal with only a few scores below expectations and observing there was overall improvement since Dr. York's testing in 2019. Cottingim expressed worry that the improvement would negatively impact his disability claim. On August 5, 2020, Dr. Hunter completed an attending physician statement in support of Cottingim's anticipated disability claim. As of that date, no diagnosis was made and no restrictions or limitations were noted.

It is Cottingim's burden to show he is disabled as defined under the plans. *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1247 (11th Cir. 2008). But the medical

evidence submitted shows that his condition stayed the same or improved in the time period from August 2019 to his disability onset date in August 2020 and failed to reflect disabling restrictions or limitations.

Based on his self-report to Dr. Morgan, Cottingim has a long-standing reputation of forgetfulness. Doc. 22-1 at 648. In December 2020, Cottingim also told Dr. Salmansohn (who was hired to provide a neuropsychological evaluation by Plaintiff's counsel) that he began having memory problems two to three years prior and would refer to himself as "the absent-minded professor." Of note, this would have been in the 2017–2018 timeframe, which was the same timeframe Cottingim had scored in the "top 14% of the norm range" on a General Intelligence Assessment. Doc. 22-1 at 564. Dr. Salmansohn also noted Cottingim may have suffered a "mini stroke" ten years prior. Despite an indication of longer-term memory issues, there is nothing in the administrative record that Cottingim's work performance was previously impacted or his ability to perform his job responsibilities was limited by any forgetfulness until two letters were submitted in September 2020 from former co-workers.[7] Cottingim's former supervisor Paul Galleberg and co-worker Michael Baer wrote letters in support of Plaintiff's disability claim stating they observed Cottingim's increasing memory lapses and a decline in his work performance over the past eighteen months. According to Baer, Cottingim left EBL "partly due to his physical and mental restrictions." Baer does not elaborate as to the other reasons Cottingim left EBL's

---

[7] It appears the letters were solicited specifically to respond to Dr. Morgan's findings of improvement. Doc. 22-1 at 573.

employment. Of significance, neither Baer nor Galleberg are employed any longer at EBL, and no employment records have been submitted evidencing negative performance reviews, reprimands, or any other documentation from EBL indicating Cottingim was not satisfactorily performing his job.

Upon receipt of Cottingim's claim for disability benefits, ReliaStar requested information regarding his dates of treatment, type of treatment, and dates of hospitalization. Doc. 26-1 at 61. Despite the administrative record being in excess of six thousand pages, the majority of the records are duplicates and there are minimal actual medical treatment records as opposed to evaluations in support of his disability claims.[8] And, as noted above, although his August 2019 brain MRI revealed "small vessel ischemic disease," he continued to work and did not seek any medical treatment until seeing Dr. Hunter beginning in June 2020, shortly after which he called ReliaStar to advise of his plans to file a disability claim. Doc. 22-1 at 741, 743. After leaving his employment in August 2020, he moved to Florida and, by all accounts, appeared to have no intention of returning to work as all social media postings indicated he was permanently retired.

---

[8] By way of example, Cottingim treated four times with Dr. David Hunter prior to his onset disability date (on June 23, June 29, July 27, and August 10, 2020), and the records of these four vists appear no less than 44 times in the administrative record. *See* Docs. 22-1 at 599–622, 624–47, 688–711; 23-1 at 588–611, 613–36; 24-1 at 18–41, 43–66, 102–25, 296–319, 321–44, 376–99, 551–74, 576–99, 631–51; 25-1 at 319–42, 344–67, 449–71, 473–96, 532–55, 620–43; 26-1 at 1–18, 495–618, 620–43, 683–706; 27-1 at 327–50, 352–75, 456–79, 481–504, 540–63; 28-1 at168–91, 193–216, 297–320, 322–45, 381–404; 29-1 at 156–79, 181–204, 285–308, 310–33, 369–92; 30-1 at 206–29, 231–54, 335–58, 360–83, 419–42.

Cottingim relies heavily on the letters prepared by Dr. Salmansohn, who was not a treater but rather an expert retained by Plaintiff's counsel. ReliaStar relied on the opinions of Drs. Spica and Boone, who stated that Dr. Salmansohn overstated Cottingim's premorbid abilities and therefore overstated any alleged decline. Even Dr. Salmansohn acknowledged that Cottingim performed in the superior range in certain areas. "Under well-settled ERISA law, the administrator is 'entitled to rely on the opinion of a qualified [medical] consultant who neither treats nor examines the claimant, but instead reviews the claimants' medical records.'" *Ness v. Aetna Life Ins. Co.*, 257 F. Supp. 3d 1280, 1291 (M.D. Fla. 2017) (quoting *Richey v. Hartford Life and Acc. Ins. Co.*, 608 F. Supp. 2d 1306, 1312 (M.D. Fla. 2009)).

The lack of medical evidence of a disabling impairment is consistent with the lack of restrictions or limitations noted by Dr. Hunter in his August 2020 attending physician statement submitted in support of Cottingim's claims. Although cognitive deficits were documented in the testing conducted, restrictions on Cottingim's activities were absent. Indeed, he continued to work many years while suffering from forgetfulness. And the only documented negative performance evaluation was from former EBL employees submitted to support his disability claims. There was no evidence from EBL documenting his inability to perform. Even his former co-worker implicitly acknowledged other reasons for his deficient performance, which may have been due to his alcoholism.

The medical records are replete with recommendations for Cottingim to obtain treatment related to his alcoholism. Doc. 22-1 at 87, 640, 651, 658. Under the terms of

the policies, an employee must be under the appropriate and regular care and treatment of a doctor in order to be considered disabled. It is clear that Cottingim did not obtain any treatment or care for his alcoholism, despite multiple doctors recommending he do so. For this reason, he additionally does not satisfy the definition of being disabled. *Mack v. Metro. Life Ins. Co.*, 246 F. App'x 594 (11th Cir. 2007) (holding that benefits denial was not *de novo* wrong where ERISA plaintiff was not receiving appropriate care and treatment from doctor on continuing basis, within meaning of disability plan, and he thus was not entitled to short term disability benefits, where he failed to undergo several doctor-recommended treatments for his alcoholism). Cottingim's arguments that ReliaStar did not assert this reason as a basis for denial is without merit as review of the plans clearly reflects that an employee must meet the definition of disability under the plans in order to obtain benefits and the requirement that Plaintiff be under the appropriate care of a doctor was communicated in ReliaStar's denial letters. *See* Doc. 22-1 at 544–45; 23-1 at 290.

Although Cottingim submitted medical records from March 2022 with a diagnosis of Alzheimer's disease, a diagnosis does not establish a disability under an ERISA plan. *See Howard v. Hartford Life & Acc. Ins. Co.*, 929 F. Supp. 2d 1264, 1294 (M.D. Fla. 2013), *aff'd*, 563 F. App'x 658 (11th Cir. 2014) (observing "doctors' diagnoses do not in and of themselves, establish a disability and inability to work"). Moreover, the records do not support that Cottingim was precluded from performing his regular occupation while in coverage.

Based on the Court's *de novo* review, the records and evidence do not establish that Cottingim met the definition of "disability" or "disabled" as that term is defined in the STD and LTD policies. And, other than his separation agreement, Cottingim has not submitted any additional records for the Court's consideration that were not a part of the administrative record. Accordingly, ReliaStar's decisions to deny Cottingim STD and LTD benefits were not *de novo* wrong and should be affirmed. ReliaStar is entitled to final summary judgment. Accordingly, it is

**ORDERED AND ADJUDGED**:

1.      Plaintiff's Motion for Summary Judgment (Doc. 31) is **denied**.

2.      Defendant's Motion for Summary Judgment is (Doc. 32) **granted**. The decision of the administrator is affirmed, as it was not wrong.

3.      The Clerk is directed to enter Judgment in favor of Defendant ReliaStar Life Insurance Company and against Plaintiff Kevin Cottingim.

4.      The Clerk is further directed to terminate any pending motions and deadlines and close this case.

**DONE AND ORDERED** in Tampa, Florida on March 18, 2024.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any